# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRANDY SISCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. CIV-09-1282-HE |
| | ) | |
| AARON RENTS, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

Plaintiff Brandy Sisco sued her former employer, Aaron Rents, Inc., its subsidiary Aaron Sales and Lease (collectively "Aaron Rents"),[1] and her supervisor, Steven Caldwell, asserting gender discrimination claims under federal and state law[2] and an intentional infliction of emotional distress claim under state law. Summary judgment was granted in defendants' favor on all but plaintiff's sexual harassment/hostile work environment claim.[3] That claim, asserted against Aaron Rents only,[4] was tried to the court. Having considered

---

[1]The parties have not distinguished between the two entities in their pleadings.

[2]Plaintiff asserted pregnancy discrimination, hostile work environment and constructive discharge claims. Defendant Aaron Rents was granted summary judgment on plaintiff's claims for pregnancy discrimination and constructive discharge. Caldwell was granted summary judgment on plaintiff's intentional infliction of emotional distress claim.

[3]While this claim was asserted under both Title VII and state law, the court's rejection of plaintiff's constructive discharge claim precludes her from claiming she was sexually harassed in violation of Oklahoma public policy. Medlock v. United Parcel Serv., Inc., 608 F.3d 1185, 1198 n.10 (10th Cir. 2010) ("Burk provides a tort remedy only for an employee's actual or constructive discharge.").

[4]Plaintiff asserted all her claims against both defendants in her complaint. However, as Title VII precludes individual supervisor liability, the court treated her federal claims as if they were asserted against Aaron Rents only. Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996) (personal

the parties' evidence and arguments, the court concludes judgment should be entered in defendant's favor as to plaintiff's hostile work environment claim.

Factual Background and Findings

The evidence at trial established the following facts, most of which were undisputed. Steven Caldwell, the general manager of Aaron Rents' Ponca City store, hired plaintiff as a customer service representative in April, 2008. She worked at Aaron Rents for approximately seven months, quitting her job in November, 2008.

When Aaron Rents' employees[5] are hired, they are provided with a copy of the company's Policy Manual.[6] Defendants' Exhibit 222. New employees are required to sign a Policy Manual Acknowledgment in which they acknowledge they have read and understand specified policies, including the company's non-discrimination and sexual harassment policy. The anti-harassment policy in effect when plaintiff was hired provided in pertinent part:

> **If you feel you have been discriminated against, sexually harassed, or denied advancement for which you are qualified, please call the Atlanta Home Office toll free at 800-335-2033 to report any such situation.** Your concerns will be investigated and swift and appropriate remedial action will be taken if violations of our policy are discovered. Be assured that your call will be treated in the strictest confidence possible and you will incur no

---

*capacity suits against supervisors (who do not otherwise qualify as "employers") are inappropriate under Title VII).*

[5]*Defendant referred to its employees as associates.*

[6]*Aaron Rents' employees are supposed to retain a copy of the company's policy manual after they are hired. Plaintiff's testified she was not given a copy to retain, although she had access to it on the company's intranet website.*

reprisal for reporting good faith claims.

Defendant's Exhibit 222.004 (emphasis in the original). The acknowledgment also included the following statement:

> I understand and acknowledge that I have a copy of the Company's Policy on Non-Discrimination, Sexual Harassment and Open Advancement. I understand that neither a member of Management or any fellow associate is authorized to engage in any conduct that violates this policy and I agree to notify the Company by calling the toll free number (800-335-2033) if I witness or believe I have been subjected to sexual harassment or any other form of discrimination.

Defendant's Exhibit 145.[7]

Plaintiff signed a Policy Manual Acknowledgment on April 8, 2008. *Id.* She also underwent training, as a new employee, which included a segment on defendant's policies and procedures regarding harassment and discrimination. Defendant's Exhibit 291.020-024. The 1-800 number for reporting sexual harassment was on each of plaintiff's paychecks/earnings statement.[8] Under "Important Message" was printed "To report discrimination/sexual harassment call 1-800-335-2033." Defendant's Exhibit 227. Steven Caldwell received training regarding the company's discrimination and harassment policies both as a new employee and, to a lesser extent (at least initially), as a store manager.

Plaintiff worked in close proximity with Caldwell and other Aaron employees, including her cousin, Jake Brown, who was a sales manager. She officed in the same room

---

[7]*The original acknowledgment page which the associates sign is returned to Aaron Rents' corporate office. Defendant's Exhibit 222.001.*

[8]*Plaintiff's salary was directly deposited into her bank account. In lieu of an actual check she received an earnings statement.*

with Caldwell and several other associates. Their desks were approximately four feet apart. Consequently, plaintiff could overhear others' conversations. During plaintiff's tenure at the store, Caldwell engaged in disgusting, juvenile behavior – played "pull my finger" fart jokes, discussed his bowel habits and fecal matter, and blew his nose into his hands and then displayed the mucus.[9] He also discussed, in plaintiff's presence, his trips to Sadie's, a local strip club. The nature and frequency of those discussions was disputed; the court finds they happened on frequent occasions and on occasion involved discussions of the stripper's anatomy, Caldwell's dislike of lap dances, and the like.[10] One male coworker testified that he had daily "gentleman conversations" with Caldwell about the club that plaintiff could have overheard.

The evidence established that, on at least one occasion, Caldwell showed to others and commented on emails or text messages from his wife that were sexual in nature.[11] The evidence also established that, on one occasion, plaintiff commented on a long black dress plaintiff had worn to work. Plaintiff and Caldwell have different versions of exactly what was said. Caldwell says he just told her she looked pretty. Plaintiff says he told her she looked attractive, but that he wasn't interested in her and that she didn't need to "flaunt it."

---

[9]*While inappropriate, such behavior alone, which was directed at all employees, is not actionable under Title VII as sexual harassment. See* Bolden v. PRC Inc., *43 F.3d 545, 551 (10th Cir.1994).*

[10]*The court did not find Caldwell's testimony, to the effect that the discussions were only of a "what did you do over the weekend" variety, to be credible in light of other evidence offered.*

[11]*Caldwell's wife testified that such messages were sent. Caldwell's testimony to the effect that he could not remember whether the messages included sexual content was not credible.*

Although it is unnecessary to determine the exact language used, the evidence persuaded the court that the comment was directed to plaintiff because of her sex and her level of sexual attractiveness to Caldwell, and went beyond a mere comment that she looked nice.

Plaintiff complained about Caldwell's comments and behavior to Brown and other co-workers, but did not mention Caldwell's misconduct to John Kurtzhals, the store's regional manager. The evidence established that Kurtzhal visited and called the Ponca City store regularly and was accessible to the employees. Plaintiff asked Caldwell how to report a complaint and he referred her to the number on her paycheck. Both James Pevy, a co-worker, and Brown also directed plaintiff to the company's 1-800 hot line. On one occasion, after Brown reminded plaintiff of the number, he offered to pursue her concerns on her behalf. She declined and said would take care of it herself. Plaintiff did not, though, call the sexual harassment hot line number until November, after an incident involving a medical release form.

The medical release form arose out of plaintiff's illness on Monday, November 3, 2008. She went to the emergency room and was discharged at approximately 10:00 p.m. that evening. The next day, November 4, she dropped off a medical release, which included a "return to work" date of November 9, 2008, at the Ponca City store. Defendant's Exhibit 163. When Caldwell looked at the release, he thought the return date had been altered from November 4 to November 9. He contacted Kurtzhals, who advised him to call Jeremy McClaney, an employee relations specialist at Aaron Rents' Atlanta (home) office, and to contact the hospital. A hospital employee informed Caldwell by fax that 11/9/08 was not

the date the hospital had in its records as plaintiff's release date. Defendant's Exhibit 164. Caldwell provided this information to Kurtzhals, who instructed him to call plaintiff and tell her to report to work the next day.[12] He did and she said "okay," but she did not show up for work again. Instead, following her conversation with Caldwell and several with Brown,[13] plaintiff called one or more law firms and Aaron Rent's hot line.

Plaintiff got a voice recording when she called the 1-800 sexual harassment number. She left a message stating that she had a complaint about Caldwell. McClaney returned her call, but did not reach her. He left a message for her to call him but, when he did not hear back from her, called Kurtzhals on November 5, 2010, and asked him to contact plaintiff. Kurtzhals called her about 10:30 a.m. on November 5, and asked her what her complaint was. She said it was about Steve. He asked her if she could elaborate and she said no, that she was on the way to her attorney. He told her okay, but that he needed to know the basis for her complaint. Plaintiff responded that she just wanted to talk to McClaney. Kurtzhals then asked her if she had his phone number and she said she did. Defendant's Exhibit 172. Kurtzhals then called McClaney and told him what plaintiff had said. Later that day Kurtzhals drove to Ponca City to learn the basis for plaintiff's complaint about Caldwell. When he arrived he told Caldwell that he needed to speak with the employees, but did not tell Caldwell why he was there.

---

[12]*Kurtzhals called the medical center the next day, November 5, and verified that plaintiff's release date was November 4.*

[13]*Plaintiff knew, from her conversations with Brown, that Caldwell thought the form had been altered.*

Kurtzhal interviewed all of the individuals who were then employed at the Ponca City store except for Caldwell and the delivery drivers. The first associate Kurtzhals spoke with was Brown, who was, as noted above, both a co-worker and a cousin to whom plaintiff was close. Brown told Kurtzhals he was conducting an investigation and asked what plaintiff's concerns were and why she was going to a lawyer. Brown told him plaintiff was upset with Caldwell because he had remarked, several months earlier when she wore a black dress, that she looked nice in it. Brown said he did not think it was a "big deal" at the time and that plaintiff would only bring it up when she was mad at Caldwell. Kurtzhals asked Brown to write a statement and include in it "everything that [plaintiff] was complaining about." The only thing Brown mentioned in that statement was Caldwell's black dress comment. Defendant's Exhibit 169.

During the interview Brown told Kurtzhals that plaintiff had come by his house the night before with some paperwork she was drawing up for her lawyer. What she showed him was a letter she had written "to detail the harassment and embarrassment that [Caldwell][had] put [her] through during [her] employment." Plaintiff's Exhibit 6. In the letter plaintiff listed various things Caldwell had said or done that she generally described as being "disgusting, unprofessional behavior." *Id.* Plaintiff's own testimony was that the letter was a sort of running tally of Caldwell's offensive conduct, including the actions which bothered her the most, and that she had developed the list over an extended period of time. Plaintiff asked Brown to sign the letter, which he did. Brown told Kurtzhals that he had signed it because one of the things plaintiff claimed Caldwell had done was to show her his performance

review and that, when he learned that Caldwell had shared his review with plaintiff, he became angry. Brown wrote a second statement on November 5 explaining the circumstances surrounding his execution of plaintiff's letter. Defendant's Exhibit 168.

After speaking with Brown, Kurtzhals interviewed another associate, Jodee Clement. She told him she did not know why plaintiff was consulting an attorney and said she had not witnessed any sexual harassment. She said plaintiff might be angry about the way Caldwell had handled a bonus she was entitled to receive. A third associate, Justin McAffey, told Kurtzhals that "Steve [was] awesome." He did not report any unprofessional conduct.

Based on these interviews, Kurtzhals concluded that plaintiff's complaint about Caldwell was due to the dress comment. He faxed his interview notes, together with his notes from his conversations with Cindy Young at the medical center and with plaintiff, to McClaney. See defendant's Exhibits 171-74. That concluded Kurtzhals' investigation. The company did not hear anything more from plaintiff about her complaint against Caldwell until a couple of weeks later when she filed her lawsuit.

### Discussion and Conclusions of Law

"To establish [that] a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007) (internal quotations omitted). Here, the

evidence was undisputed that plaintiff, as a woman, is a member of a protected class. Plaintiff also established that she was subjected to unwelcome harassment, as evidenced by the various incidents and her complaints to Caldwell, Brown and others.

The question of whether the harassment was based on sex is somewhat closer. Much of the behavior plaintiff relies on to establish her claim, while inappropriate (and sometimes remarkably so), was directed at all employees and was not sexual in nature. *See* <u>Bolden v. PRC Inc.</u>, 43 F.3d 545, 551 (10th Cir.1994) ("General harassment if not racial or sexual is not actionable."). To recover, "plaintiff must produce evidence that she was the object of harassment <u>because of her gender</u>." <u>Chavez v. New Mexico,</u> 397 F.3d 826, 833 (10th Cir. 2005) (quoting <u>Penry v. Fed. Home Loan Bank of Topeka,</u> 155 F.3d 1257, 1261 (10th Cir.1998)).[14] As at least some of the harassing behavior established by plaintiff was sexual in nature, the third element was established as well.

The determinative question is whether plaintiff established sex-based harassment of such a severe or pervasive nature that it altered the terms and conditions of her employment and created an abusive working environment. While the question is close, the court concludes plaintiff did not establish this element of her claim.

As noted above, there was evidence of sexually oriented harassing behavior involving

---

[14] *"Conduct that appears gender-neutral in isolation may in fact be gender-based, but may appear so only when viewed in the context of other gender-based behavior."* <u>Chavez</u>*, 397 F.3d at 833. When a plaintiff introduces evidence of both gender-based and gender-neutral harassment, it is for the fact finder to decide whether, viewing the evidence in context, all of the allegedly harassing conduct can be considered to be the product of sex and gender hostility. Id. Here, in light of the evidence presented, the court concludes that some but not all of the harassing conduct was gender based.*

the black dress comment, Caldwell's comments regarding the strip club, and his comments or actions as to his wife's emails. However, the "black dress" comment was a single, isolated occurrence and, while sexually based, was not particularly egregious even under plaintiff's description of it. The strip club comments and those related to Caldwell's wife were not directed toward plaintiff, but were intended either for others or were such that anyone within earshot could hear them. The court concludes the evidence as to these incidents is not sufficient to establish that the work environment was "permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted).

Plaintiff offered evidence, principally in the form of her own testimony, of other incidents or comments by Caldwell which, if true, would be sufficient to establish a sufficiently severe or pervasive level of harassment. In particular, she testified that Caldwell had made comments about her breasts and how she looked in jeans, how his penis was like a Coke can, how he had licked strawberries off the chest of another woman at some function, and other details as to sex with his wife. She also testified that, on an occasion when she accompanied Caldwell to the bank to make a deposit and then to his home where he changed clothes, he invited her to come into his house. However, for multiple reasons, the court finds plaintiff's testimony as to these additional events not to be credible.

Most telling is the fact that, in preparing her running list of complaints as to Caldwell (the letter, plaintiff's exhibit 6), she did not include most of these incidents on the list. These alleged comments are more serious and indicative of inappropriate conduct on Caldwell's

part than the items she actually included in the letter and—if they were really said—there is every reason to believe plaintiff would have included them on her list. She did not. Also, there is Brown's testimony to the effect that he thought, from plaintiff's comments to him, that her concern was with Caldwell's black dress comment because that's what she brought up when she got mad at him. Again, if the disputed comments had been made, it seems unlikely that the dress comment is what plaintiff would have focused on in conversations with Brown. Further, the evidence established that plaintiff had encouraged both Brown and her husband to seek employment with Aaron Rents, suggesting it was a good place to work. If plaintiff subjectively perceived the atmosphere at Aaron Rents to be abusive, it seems most plausible that her comments to Brown and her husband would have been otherwise. *See id.* at 21-22 ("[I] the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). The court concludes the evidence was insufficient to establish that these more egregious alleged comments were made.

Also undercutting plaintiff effort to prove an abusive environment (and her credibility) is her suggestion that she took an antidepressant for two months in the summer of 2008 because of Caldwell's conduct. She testified that she told the physician who prescribed the medication that she needed the drug because of job stress and her husband's deployment. However, the medical record of plaintiff's doctor's appointment was dated March 24, 2008, before she was hired to work at Aaron Rents, so any "job stress" she was experiencing could

not have been attributable to events at Aaron Rents.[15]  Plaintiff's exhibits 20, 22.

The timing of plaintiff's complaint undercuts her effort to prove an abusive environment and also her credibility.  She called the sexual harassment hot line only after she knew that Caldwell thought she had altered the medical release form.  While plaintiff's "straw that broke the camel's back" explanation is not inherently implausible, the more likely explanation in the circumstances is that plaintiff knew she was in trouble and decided that the best defense was a strong offense.  The court is persuaded from the evidence that the medical release form had in fact been altered and that plaintiff, or someone else with her knowledge, had done it.

In short, while there was evidence of sexually-based, harassing conduct by Caldwell and the question is close, the court concludes plaintiff's evidence was insufficient to establish conduct "so objectively [or subjectively] offensive as to alter the conditions of [her] employment."  Harsco Corp., 475 F.3d at 1187 (internal quotations omitted).  Her hostile work environment claim fails for that reason.

The claim also fails for a second reason.  Even if plaintiff had shown she was subjected to a sexually hostile work environment, she still would not prevail, as defendant established the Ellerth/Faragher affirmative defense.[16]  This affirmative defense "comprises

---

[15]*Plaintiff filled the prescription on April 15, 2008, only a week after she had started working at the store.*

[16]*Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). The court previously held that the Ellerth/Faragher affirmative defense was available.  See November 19, 2010, Order.  Aaron Rents had the burden of establishing the affirmative defense by a preponderance of the evidence.  Pinkerton, 563 F.3d at 1059.*

Page 12

two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Pinkerton v. Colo. Dept. of Transp., 563 F.3d 1052, 1061-62 (10th Cir. 2009) (quoting Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1261 (10th Cir. 1998)).[17]

Aaron Rents established that it exercised reasonable care to prevent and correct the offending behavior. It established an appropriate formal policy prohibiting sexual harassment. The evidence showed that all employees, including plaintiff, were trained as to that policy. Associates received training when hired regarding defendant's anti-harassment policy and the company's procedure for lodging a complaint. Although defendant's training of Caldwell as a manager was less than ideal,[18] he at least had basic training in the company's policy. The phone number for reporting sexual harassment was printed on each employee's paycheck/earnings statement, an ongoing reminder of both the policy and the means for responding to violations of it. Given the company's policy and the steps it had taken to communicate those to all employees, the court concludes it used reasonable care in attempting to prevent harassing behavior. Further, the evidence established that it acted

---

[17]*The defense is available where, as here, plaintiff asserts the employer is vicariously liable based on a supervisor's conduct that resulted in a hostile work environment but not in some tangible employment action. Pinkerton, 563 F.3d at 1058-9.*

[18]*Much of the training Caldwell received as a manager came after he had been functioning in that capacity for some time. The incidents as to plaintiff occurred during the intervening (i.e. prior to the more extensive training) period.*

promptly to correct the offending behavior. Plaintiff's phone call to the hotline number was promptly returned and, despite her lack of cooperation, a reasonably thorough investigation was conducted immediately. These facts showed that Aaron Rents exercised reasonable care to prevent and correct harassing behavior in the workplace.

The second element of the defense—unreasonable failure to take advantage of the corrective opportunities afforded—was also established. Plaintiff, although repeatedly directed to the hot line, failed to call it until the day she quit.[19] She also failed to report Caldwell's inappropriate conduct to the regional manager and dissuaded others from pursuing the matter on her behalf. The court concludes plaintiff unreasonably failed to inform defendant about the harassment she suffered. *See* Pinkerton, 563 F.3d at 1063 ("The primary objective of Title VII is not to provide redress but to avoid harm. To promote this objective of avoiding harm, Title VII in general, and the Ellerth/Faragher defense in particular, is premised on a cooperative framework wherein the employee reports sexual harassment and the employer remedies the improper conduct.") (internal quotations omitted).

The court concludes Aaron Rents met its burden of proof with regard to both elements of the Ellerth/ Faragher defense and would therefore not be vicariously liable for Caldwell's conduct even if the court's decision had been otherwise as to whether that conduct created a hostile work environment. Accordingly, the court finds in favor of defendant Aaron Rents

---

[19]*Defendant's procedure for handling complaints was not ineffective simply because not all calls were answered personally. The voice mail system in place allowed plaintiff to leave a message and her call received prompt attention.*

on plaintiff's sexual harassment claim.  Judgment will enter accordingly.

**IT IS SO ORDERED**.

Dated this 29th day of December, 2010.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE